IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| ANGELA HINES, | ) C/A No. 6:18-cv-00007-DCC |
| Plaintiff, | ) |
| | ) |
| v. | ) **OPINION AND ORDER** |
| | ) |
| THE E.I. DUPONT DE NEMOURS | ) |
| AND COMPANY LONG TERM | ) |
| DISABILITY PLAN, | ) |
| | ) |
| Defendant. | ) |

This is an action seeking long-term disability benefits which is governed by the Employee Retirement Income Security Act ("ERISA"). This matter is before the Court on the parties' Joint Stipulation, ECF No. 18, their Cross-Motions for Summary Judgment ECF Nos. 17, 19, and is based on an administrative record, ECF Nos. 18-1 to 18-26. For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED**, and Plaintiff's Motion for Summary Judgment is **DENIED**.

## I. FINDINGS OF FACT

### A. Plaintiff's Employment and Sick Leave

On November 29, 2010, E.I. du Pont de Nemours and Company ("DuPont") hired Plaintiff as an Operator/Mechanic at its Cooper River Plant. In this position, she monitored, operated, and performed basic maintenance on equipment. It is undisputed that Plaintiff was a participant in the E.I. du Pont de Nemours and Company Total and Permanent Disability Income Plan ("TPD Plan" or "Defendant").

On May 4, 2012, Plaintiff reported to DuPont's medical department because she

felt weak and clammy. At that time, her blood pressure was high and an electrocardiogram (EKG) showed tachychardia (elevated heart rate). She was sent to an emergency clinic. There, she was told to go home, rest, and follow up with her primary care doctor. Plaintiff briefly reported back to work on May 14, 2012, but went back to the medical department that day. She had high blood pressure and an elevated heart rate. She also reported passing out at home and having episodes in which she felt exhausted, weak, and unable to tolerate heat. Her last day of work at DuPont was May 14, 2012.

### B. Plaintiff Obtained a Diagnosis with Limited Work Restrictions.

After going out of work, Plaintiff's doctor of osteopathy, Harold Nicolette, sent her to Dr. Robert Leman, the co-director of an electrophysiology lab. On June 12, 2012, Plaintiff met with Dr. Leman and reported she had some dizziness and fatigue with activity and effort. She reported that her resting heart rate was 100 beats per minute ("bpm"). Dr. Leman, however, noted that Dr. Nicolette had earlier performed a Holter monitor study showing an average heart rate of 88 bpm, a minimum rate of 60 bpm, and a maximum rate of 154 bpm with exercise. He noted that Plaintiff's recent EKG showed "normal" activity and a recent treadmill test was "negative" for tachycardia. [Her] physical exam was unremarkable and her "heart [was] regular." Dr. Leman gave Plaintiff a preliminary diagnosis of postural orthostatic tachycardia syndrome ("POTS")[1], albeit somewhat uncertainly: "she probably has a POTS like feature of has [sic] intrinsic anxiety with elevated heart rates attributable to that." Dr. Leman did not order any work restrictions.

---

[1] POTS is characterized by increased heart rate when changing positions from lying to standing.

At her next appointment on July 23, 2012, Plaintiff said "she went home and read about POTS and she feels she is in agreement with me [Dr. Leman]." She said she did not feel any better and had to urinate frequently. Dr. Leman noted that Plaintiff had a history of "questionable" fibromyalgia symptoms and diarrhea. He also noted that Plaintiff was not complying with his directive to reduce water intake. A physical exam was unremarkable. Dr. Leman recommended that Plaintiff switch to decaffeinated coffee, add more sodium to her diet, and stop drinking so much water. He thought this treatment would avoid the diarrhea and urinary frequency and "would improve her symptoms entirely." He stated that Plaintiff "should avoid dangerous work projects" but did not impose any other work restrictions.

On September 24, 2012, Dr. Leman stated that Plaintiff has "multiple somatic complaints and what I believe to be POTS." Her physical exam was unremarkable except for high blood pressure and heart rate. He again noted that Plaintiff was not complying with his recommendation to reduce her water intake. Dr. Leman stated:

> Her previous workup has been relatively unremarkable and it has been difficult to get her to do the things that I think would be helpful with her care. I think she understands this but has this almost addiction to water. Obviously, we may have to think about psychiatric or endocrine help if this continues.[2]

Dr. Leman opined that Plaintiff might be able to be retrained and work other jobs: "I really think we are going to have to retrain her and get her a job that she can do with her symptoms. . . . We will try to talk with her job sources to see if we can get her retrained

---

[2] The Administrative Record does not show that Plaintiff ever sought help from a psychiatrist or endocrinologist.

to a different job."

On October 1, 2012, Dr. Leman wrote a letter stating that Plaintiff had been "diagnosed with POTS." The letter further stated that Plaintiff "should avoid any job duties that would put her at risk of injury which would include utilizing heavy equipment." Dr. Leman, however, did not state that Plaintiff was incapable of any work activity, and he did not provide specific work restrictions other than use of heavy equipment.

On October 4, 2012, Dr. Marcus Schaefer wrote a letter stating that Plaintiff had "what appears to be a cardiovascular problem. Unfortunately, several physicians including cardiologists have been unable to accurately diagnose and effectively treat her illness. At times, she has an arrhythmia, which at time leads to syncope and collapse." He noted that Plaintiff's job description "requires her to be able to start up and shut down hazardous equipment," and "work at high, precarious places." He recommended that she be "[m]edically restricted from performing the job responsibilities of an Operating Technician" for at least 6-12 months. He did not state that Plaintiff was unable to perform other occupations, and he did not provide work restrictions, aside from performing the hazardous duties associated with her own job. He was unable to estimate when Plaintiff could return to work at her current position. Yet, he stated: "Because she is otherwise healthy and robust at the age of 37 it is my opinion found [sic] to resolve her near syncopal collapse and severe fatigue will be resolved."

### C. Plaintiff Applied for and Began Receiving Disability Benefits from DuPont.

On October 4, 2012, Lynne Jamison, a nurse in DuPont's medical department, filled out a medical evaluation form and submitted a claim for disability benefits to Aetna Life Insurance Co. ("Aetna") on Plaintiff's behalf, along with medical records. Ms. Jamison

listed Plaintiff's objective diagnostics (episodes of elevated heart rate and blood pressure), as well as her subjective complaints (weakness, blurred vision, delayed reflexes, intolerance of heat, etc.). She stated the primary diagnosis was "POTS Syndrome per Robert Leman, MD," with secondary diagnoses of hypertension and tachycardia. She stated the POTS diagnosis interfered with Plaintiff's work activities. She described a number of current limitations (cannot stand for longer than one hour, cannot bend over or squat without becoming dizzy, etc.) and purported permanent restrictions (no work in the heat, no sitting for long periods, etc.). Presumably, these limitations were reported to Ms. Jamison by Plaintiff because they are not found in the medical records of the treating physicians in the Administrative Record. Ms. Jamison also wrote, albeit ambiguously, that Plaintiff's impairments were permanent and she was not able to do clerical activity,[3] though no physician had made those findings.

On November 7, 2012, Aetna reviewed the information available at that time and determined that, "at present," Plaintiff was totally disabled from any gainful occupation. The approval letter, however, noted that "[Aetna] will periodically re-evaluate [Plaintiff's] eligibility by requesting updated medical information from [Plaintiff's] attending physician or an independent physician."

### D. Plaintiff Continued to Seek Medical Care After Disability Finding.

On March 25, 2013, Plaintiff met with Dr. Leman and her primary complaint was headaches. Dr. Leman stated that Plaintiff "had some symptoms that were thought to be

---

[3] Ms. Jamison checked a box indicating that Plaintiff suffered from a moderate limitation of functional capacity and was capable of sedentary, clerical activity. Her contradictory written remarks, however, state that Plaintiff was not able to do clerical activity. Ms. Jamison also stated that she did not do a functional capacity evaluation.

POTS."  Plaintiff admitted that "[s]he does drink two glasses of wine about every other day."   Dr. Leman appeared to be out of ideas, noting "her symptom complex is very difficult" and "[he has] given it [his] best."  Dr. Leman recommended that Plaintiff see a neurologist and did not mention any work restrictions.

As part of a neurological work up, on April 11, 2013, Plaintiff underwent an MRI of her brain.  Multiple doctors reviewed the MRI results and found that everything looked normal and unremarkable.   On June 6, 2013, Plaintiff underwent a sleep study administered by Dr. Jonathon Halford, a doctor board-certified in sleep medicine.  Dr. Halford observed normal cardiac and sinus rhythms throughout the night.  He found no significant evidence of sleep apnea.

On April 28, 2014, Plaintiff was seen by Dr. Lars Runquist, a cardiologist.  Dr. Runquist performed a physical exam and observed that Plaintiff "is a middle aged healthy appearing white female in no acute distress" with "regular [heart] rate and rhythm," normal bowel sounds, "no lower extremity edema," and "normal pulses [in] all extremities."  He noted that Plaintiff was given a POTS diagnosis, but she "never had a tilt test."  He thought more diagnostic evidence was needed and ordered an EKG, a Holter monitor study, and a tilt table test to be performed by Dr. Leman. He did not issue work restrictions.  On April 28 and May 20, 2014, Plaintiff underwent two EKGs, and the physicians did not find any abnormalities.    Plaintiff also underwent a Holter monitor study that showed "no arrhythmia" and "no symptoms."

On June 2, 2014, Plaintiff was seen by Dr. Leman who noted that she "has been very difficult to treat because of her inability to follow therapy that is recommended."   Her physical exam showed: "her heart is regular, the PMI is normal, and she has no murmurs

or gallops. . . . Her bowel sounds are normal. Her extremities reveal good pulses and no edema." Dr. Leman noted that Plaintiff "has a lot of somatic complaints," but her MRI was "normal" and the sleep apnea study was "normal." He agreed with Dr. Runquist that "we should do a tilt table test," but could not do so because "unfortunately [their] table [was] not working at the present time." He did not discuss work restrictions.

### E. Plaintiff Moved to Georgia.

In August 2014, Plaintiff moved to Georgia. Plaintiff did not establish medical care with a doctor in Georgia until September 3, 2015, over a year from her last appointment with Dr. Leman. Plaintiff's new primary care physician was Dr. Robert Lemley. Her initial appointment was on September 3, 2015, with a follow-up on October 16, 2015. Dr. Lemley's physical exams were relatively unremarkable. Plaintiff gave Dr. Lemley disability forms, but he had little knowledge of her medical condition at that time and did not have prior medical records to rely on. Yet, at Plaintiff's request, Dr. Lemley went ahead and filled out the form for Plaintiff. He did not list any diagnosis. He noted that Plaintiff reported no improvement and that she was unable to stand for periods of time. Aside from the reference to prolonged standing, he did not impose any work restrictions or state that she was unable to work in any capacity.

Dr. Lemley ordered lab testing and referred Plaintiff for evaluation with a neurologist. Subsequent lab testing was negative. Plaintiff was seen by a neurologist, Dr. Hartmann, on February 1, 2016. (AR 000672, 000727; 816-818.) The neurologist's evaluation, including nerve testing and electromyography (EMG) studies, did not find any abnormalities. At a follow-up appointment on March 25, 2016, Dr. Lemley indicated that further treatment of her postural lightheadedness and completion of disability forms

should be done by specialists. He told Plaintiff to stop smoking and go the gym every other day.

### F. Aetna Denied Plaintiff's Claim for Failure to Provide Sufficient Evidence of Continued Disability.

Before Plaintiff established care with Dr. Lemley, Aetna sent multiple requests for updated medical information. On June 11, 2015, Aetna sent a request for "objective medical evidence from [her] attending physician to determine if [she] remain[ed] totally disabled," and instructed Plaintiff that her current physician needed to complete an enclosed Attending Physician Statement ("APS") and return it by July 10, 2015. Plaintiff did not respond. On July 16, 2015, Aetna sent Plaintiff a second request for updated medical evidence and an APS. On August 28, 2015, Plaintiff informed Aetna that she had moved to Georgia, admitted that "I do not currently have a regular doctor," and requested more time to find a doctor.

On September 1, 2015, Aetna responded and provided Plaintiff eight additional weeks to find a doctor, provide a medical update, and return a completed APS. On September 4, 2015, Plaintiff sent Aetna the office visit notes from her initial visit with Dr. Lemley. Aetna replied that Plaintiff needed to submit a completed APS. On October 6, 2015, Aetna sent another request for proof of continued disability with a deadline of November 4, 2015. The letter noted: "the physician statement must provide us with information regarding how your medical condition imposes restrictions and limitations upon your ability to perform any gainful work."

On October 16, 2015, Aetna received Dr. Lemley's office visit notes from October 16, 2015, and his completed APS. Aetna analyzed the new records and observed that

there was "no real information" in the APS, "no DX [diagnosis] listed," and that the doctor "lists only R&Ls [restrictions and limitations] ee [employee] has told him about[,] not symptoms he is aware of." On October 21, 2015, Gloria Hoehne, a registered nurse, performed a clinical review of the file, analyzing the old and new medical records in detail. Ms. Hoehne concluded there was no objective medical evidence showing any restrictions or limitations on Plaintiff's ability to work:

> The information currently on file does not provide any abnormal physical, neurological, cardiac or other findings that would preclude the claimant from performing full time functional activities in any capacity.

> It was previously noted there was a working diagnosis of POTS-like symptoms with reported episodes of dizziness & syncope but there are no diagnostic workups, cardiology notes or confirmation of diagnosis on file.

> The claimant's reported symptoms would only warrant avoidance of safety sensitive activities (e.g. operation of dangerous machinery, working at heights, working in potentially dangerous situations/environments, possible driving restrictions, etc.) all depending on the most recent reported syncope episode.

> At this time we have no physician providing specific R&L's or recommending current total functional impairment with supporting correlated physical & diagnostic exam findings from a physical, neurological or cardiac perspective.

In January 2016, Aetna called Plaintiff and informed her that more medical information was needed to substantiate her disability. Plaintiff stated she had a neurologist appointment on February 1, 2016, and Aetna instructed her to send any new neurology records because Dr. Lemley's office visit notes were not enough to show continued disability. Plaintiff, however, did not send any new records after her appointment.[4]

---

[4] The February 2016 neurology records (which did not find any neurologic abnormalities) were not received by Aetna until September 2016, during a later appeal.

On February 22, 2016, Aetna sent Plaintiff another written request for updated medical information and a physician statement addressing any restrictions and limitations imposed by her medical condition. Aetna advised Plaintiff that her benefits would be terminated if the requested information was not received by March 22, 2016. Plaintiff did not respond.

On March 30, 2016, Aetna informed Plaintiff that she was no longer eligible for benefits under the TPD Plan because she had failed to respond to requests for evidence of ongoing disability. In its determination letter, Aetna detailed its repeated requests for medical information from June 2015 through February 2016, a period of over eight months. Aetna explained that the new office visit notes and physician statement from Dr. Lemley contained "very limited information" and the registered nurse, Ms. Hoehne, found that the medical information on hand "was not enough to support [Plaintiff's] disability." Aetna explained that Plaintiff had completely failed to respond to the most recent requests for proof in January and February. Plaintiff's benefits were terminated effective March 31, 2016.

### G. Plaintiff's Sees a New Cardiologist Who Casts Doubt on POTS Diagnosis.

On April 7, 2016, Plaintiff was seen by Dr. Robert Sorrentino, a cardiologist. Dr. Sorrentino noted that Plaintiff "recently had a normal EMG study," and that her most recent syncope episode was September 15, 2015, over six months ago. Plaintiff "complain[ed] of chronic fatigue, dizziness, short bursts of palpitations (seconds), and lightheadedness," as well as diarrhea. However, Plaintiff inconsistently reported that her worst time of day was in the afternoon (to Dr. Sorrentino) and in the morning (to the nurse). Dr. Sorrentino noted there was no history of tilt-table testing. His physical exam

revealed normal functioning of the respiratory, cardiovascular, gastrointestinal, neurologic, and other systems. There were no significant changes in heart rate and blood pressure when moving from lying to sitting to standing. Overall, Dr. Sorrentino thought the POTS diagnosis was "suspect without further data." He noted that Plaintiff's "neurologic complaints sound very worrisome except for the apparent lack of physical findings or abnormal studies." He further noted: "there is a very strong psychologic overlay to her many somatic complaints and she may ultimately need a psychiatric evaluation." However, Dr. Sorrentino declined to make a psychiatric referral until he reviewed Plaintiff's prior records.

On April 21, 2016, Plaintiff had a follow-up appointment with Dr. Sorrentino. Plaintiff reported continued dizziness with standing and daily palpitations. Her physical exam was normal, and there were no significant changes in her blood pressure and pulse rate when moving from lying to sitting to standing. Dr. Sorrentino stated that her symptoms did not match typical POTS. He ordered a tilt table test. He stated that if there was no definitive diagnosis, he would recommend behavioral therapy and psychotherapy. Dr. Sorrentino also ordered a urinalysis to test for carcinogens, which came back negative.

On May 18, 2016, Dr. Sorrentino administered a tilt table test to revisit the POTS diagnosis. Plaintiff had a "normal response," and "[t]here was no evidence for postural orthostatic tachycardia syndrome." (AR 000693.) This test essentially refuted the POTS diagnosis. In the patient discharge instructions, next to the prompt for "physical activity," Dr. Sorrentino wrote there was "no restric" as in "no restriction" for physical activity.

### H. Plaintiff Appealed the Initial Denial of Benefits.

After the initial denial of benefits, Plaintiff filed an appeal on September 26, 2016. In support of the appeal, Plaintiff provided Aetna with the additional medical records discussed above, including records from the South Carolina physicians (Dr. Leman, Dr. Runquist, and Dr. Halford) and the more recent Georgia physicians (Dr. Lemley, Dr. Hartmann, and Dr. Sorrentino). Plaintiff later supplemented the appeal with October 2016 medical records relating to treatment for a grease burn that Plaintiff got while cooking chicken.

The appeal stated that Plaintiff was totally disabled by three conditions: POTS Syndrome, hypertension, and tachychardia. The appeal referenced symptoms reported by Plaintiff: weakness, blurred vision, slurred speech, delayed reflexes, heat intolerance, and fainting. The appeal primarily relied on the Social Security Administration's finding that Plaintiff was disabled.

### I. Two Outside Physicians Performed a Full Review of the Claim File.

In order to evaluate Plaintiff's appeal, Aetna arranged for two independent physicians to review the entire claim file. These peer reviews were performed by Dr. Wendy Weinstein, who is board certified in internal medicine, and Dr. Mark Sims, who is board certified in cardiovascular disease and internal medicine.

#### 1. Peer Review by Dr. Weinstein

In a lengthy report, Dr. Weinstein listed all the records reviewed and then meticulously discussed them. She individually assessed treating physicians' notes, physical exams, objective tests (MRIs, EKGs, EMGs, CT scans, Holter Monitor studies, the sleep study, blood pressure and heart rate readings, the tilt table test, lab tests,

ultrasounds, etc.), and other records submitted with Plaintiff's appeal.  Dr. Weinstein also

set up a phone conference with Plaintiff's primary physician, Dr. Lemly, and recounted

the conversation as follows:

> Dr. Lemly indicated that the claimant came to him on disability and he did
> additional evaluations due to her subjective complaints.  He stated that he
> was deferring to the specialists regarding any impairment from work.  He
> noted that there was no documentation of POTS syndrome or any
> underlying neurologic or cardiac abnormalities.  The physician stated he did
> not think that she would be unable to do sedentary work.  He said the initial
> information was based on her historical report, but there has been no
> documentation of significant abnormalities.  We discussed the fact that she
> has multiple somatic complaints and the cardiologist had recommended
> behavioral therapy with psychotherapy.  It was noted she had a
> questionable history of fibromyalgia and her symptoms of postural
> intolerance may go along with chronic fatigue syndrome, which is now
> identified as systemic exertion intolerance disorder.  However, all of this
> information is based on her subjective complaints.

Based on her review of the records and her peer-to-peer consultation with Dr.

Lemley, Dr. Weinstein analyzed a critical question: "are there any clinical findings, exam

findings, or diagnostic tests that would support any functional impairment?"  Her answer

was "No."  Dr. Weinstein reported:

> The clinical information does not document clinical findings, examination
> abnormalities, or diagnostic tests that would support any functional
> impairment.  The claimant has ongoing subjective complaints without
> documentation of underlying cardiac or neurologic abnormalities that would
> support functional impairments from any level of work. . . .
> …
>
> The information from the claimant's lawyer references her diagnosis of
> POTS, which has been disproven by the diagnostic studies.  He also
> referenced her subjective complaints, but there is no documentation of
> associated examination abnormalities that would support functional
> impairments from the job duties of any occupation. . . .  The claimant has
> multiple subjective complaints, but there is no documentation of associated
> clinical findings, examination abnormalities, or diagnostic studies that would
> support functional impairments from the job duties of any occupation from
> 4/1/16 forward.

…

There was discussion of behavioral therapy or psychotherapy, but there was no documentation of emotional dyscontrol, mental status examination abnormalities, or cognitive impairments and no documentation that the claimant would be unable to perform the job duties of any occupation.

The claimant has intermittently been on metoprolol and Lisinopril. There is no documentation that she has adverse effects from these cardiac medications that would impact her ability to work and recent notes reference her being off these medications. [discussion of other medications] However, there is no documentation of medication side effects or cognitive deficits from her prescribed medication.

The claimant has a longstanding history of multiple somatic complaints and she has had many thorough evaluations without documentation of underlying cardiac or neurologic abnormalities. She may have fibromyalgia or a type of chronic fatigue syndrome with postural intolerance, which is based on subjective complaints. However, there is no documentation of orthostatic hypotension or orthostatic tachycardia, and no documentation of autonomic neuropathy or additional musculoskeletal or neurologic examination abnormalities that would preclude the claimant from working. She has a large somatic overlay, but there is no definitive diagnosis and no documentation of any specific treatment. It has been recommended she have psychotherapy and a graded exercise program may be beneficial. There is no diagnosis and no specific prognosis. However, given her multiple somatic complaints that have been present for many years, even when she was working, it is not clear that her subjective symptoms will change. However, there is no documentation of any underlying medical diagnoses that would preclude the claimant from working.

Dr. Weinstein's opinions, as stated above, were "held to a reasonable degree of clinical certainty." She avowed that she had no incentive, financial or otherwise, "that would lead me to offer an opinion other than based on [her] honest professional assessment of the information provided for review."

### 2. Peer Review by Dr. Sims

Dr. Sims, a board-certified cardiologist, also issued a detailed report in which he listed all of the medical records reviewed and discussed the most relevant cardiology,

14

neurology, and other records. Dr. Sims spoke by phone with Plaintiff's treating

cardiologist, Dr. Sorrentino, and reported the following peer-to-peer consultation:

> Dr. Sorrentino returned my call 10/25/16, 8:35 A.M., EDT. I did have the
> opportunity to discuss the claimant's case with him at that time he indicated
> the following:
>
> The claimant's diagnosis was illusive. He believes that she has a strong
> psychological overlay. The claimant was noted to have a negative cardiac
> evaluation which included the recent performance of a Tilt Table Test which
> did not establish the diagnosis of POTS. I did ask whether from the
> cardiovascular perspective the claimant has a full-time work capacity and
> whether she was subject to any cardiovascular based restrictions or
> limitations. Dr. Sorrentino answered that the claimant has no evidence of
> cardiovascular based impairment and is not subject to any cardiovascular
> based restrictions and limitations; therefore is capable of full-time work with
> no imposed cardiovascular based restrictions and limitations. Consensus
> was reached on this issue between myself and Dr. Sorrentino.

Dr. Sims then addressed whether there was any objective medical evidence

showing that Plaintiff is functionally impaired from working:

> Based on review of the totality of provided medical records as well as on
> my discussion of the claimant's case with Dr. Sorrentino, no cardiovascular
> based impairment is supported. This is based on the negative
> cardiovascular evaluation which included a normal Tilt Table Test
> performed 05/18/16.
>
> The only cardiovascular based anomalies supported were a short PR
> interval on an ECG and a Holter Monitor on 04/28/14 which documented
> rare premature atrial contractions and a single 6 beat run of supraventricular
> tachycardia at a rate of 156. Dr. Sorrentino did not reference
> supraventricular tachycardia as a clinically relevant or impairing condition
> and opined that the claimant is capable of engaging in full-time activities
> without cardiovascular based restrictions or limitations. She has no other
> evidence of structural heart disease and the records provided for review as
> well as Dr. Sorrentino's assessment do not support a diagnosis of POTS.

Dr. Sims also noted that there was no evidence of harmful side effects caused by

Plaintiff's medications. He stated that Plaintiff's "prognosis from the cardiovascular

perspective appears to be good." He affirmed that his opinions were held to a reasonable degree of medical certainty and he had no conflicts of interest.

### J. Aetna Upheld Its Initial Determination and Denied Plaintiff's Appeal.

On November 9, 2016, Aetna informed Plaintiff that it was denying the appeal. Aetna explained: "We reviewed the entire claim file, including all medical records, attending physician statements, and your appeal letter. In order to assess functional impairment, the available medical documentation in Ms. Hines's claim was reviewed by independent peer reviewers specializing internal medicine and cardiology." Aetna reasoned that there were no cardiovascular impairments based on the findings of the treating cardiologist, Dr. Sorrentino, and the peer reviewing cardiologist, Dr. Sims. Likewise, from an internal medicine viewpoint, the treating physician, Dr. Lemley, and the peer reviewing physician, Dr. Weinstein, did not find any functional impairments. In sum, Aetna performed a full review and concluded there was no clinical evidence of a functional impairment that would preclude Plaintiff from performing the material duties of even her own occupation. On December 7, 2016, Aetna sent corrected information regarding "next steps" and informed Plaintiff that she had the right to make a second-level appeal to DuPont.

### K. Plaintiff Submitted a Second-Level Appeal, and DuPont Upheld Aetna's Determination that Plaintiff Was Not Eligible for Benefits.

On June 4, 2017, Plaintiff sent a second-level appeal to DuPont. Plaintiff also sent new medical records relating to a broken arm that Plaintiff sustained in June 2017 and the biopsy of tissue near the fracture which turned out to be a benign enchondroma (bone

tumor). Aetna prepared an "Appeal Summary" which was sent to DuPont along with the medical and other records.

The DuPont Benefit Appeals Committee evaluated all of the records provided by Aetna and by Plaintiff's attorney, including the new records from June 2017. The Committee drafted a "Summary of Facts" and held a meeting on October 25, 2017, to discuss and decide Plaintiff's appeal. On November 15, 2017, the Committee sent Plaintiff a letter notifying her that they had decided to deny the second-level appeal because Plaintiff did not provide medical evidence showing that she was and continued to be totally and permanently disabled under the terms of the TPD Plan. Similar to Aetna, the Committee did a full review and did not find records establishing that Ms. Hines was disabled.

## L. Relevant Plan Terms

It is undisputed that Plaintiff was employed DuPont and a participant in the Plan.[5] The TPD Plan states that DuPont "retains discretionary authority to determine eligibility for benefits hereunder and to construe the terms and conditions of the Plan." The TPD Plan also gives DuPont authority to delegate administration of the TPD Plan and to employ others for advice. In this case, DuPont delegated claims administration duties to

---

[5] The TPD Plan was amended in 2005 and again in 2015. The Parties disagree as to whether the 2005 or 2015 version of the TPD Plan applies. "[A]n ERISA cause of action based on the denial of benefits accrues at the time benefits are denied, and the plan in effect when the decision to deny benefits is controlling," as opposed to the plan in effect when the plaintiff allegedly became disabled or submitted her claim. *McWilliams v. Metro. Life Ins. Co.,* 1999 WL 64275, at *2 (4th Cir. Feb. 11, 1999). Here, Plaintiff's benefits were first denied on March 30, 2016. At that time, the 2015 TPD Plan was in effect and therefore is controlling. Moreover, there are no material differences between the 2005 and 2015 TPD Plan that would affect the Court's resolution of the pending motions.

Aetna.

Only an employee who is "totally and permanently disabled" may receive benefit payments under the TPD Plan.  The TPD Plan defines that term as follows:

> An individual should be considered "totally and permanently disabled" if the Company finds that he is totally disabled by injuries or disease and presumably will be totally and permanently prevented from pursuing his own occupation during a period of twenty-four (24) months at eighty percent (80%) or more of his normal monthly earnings or any gainful occupation, after a period of twenty-four (24) months provided the disability does not result from: 1. participation in willful acts contrary to law and order; or 2. any occupation or work outside the Company for compensation or profit.

This definition breaks down into two time periods:

- 24-Month Own Occupation Period: "totally and permanently prevented from pursuing his *own occupation* during a period of twenty-four (24) months at eighty percent (80%) or more of his normal monthly earnings"

- Post-24-Month Any Occupation Period: "totally and permanently prevented from pursuing … *any gainful occupation*, after a period of twenty-four (24) months"

Here, Plaintiff received long term disability ("LTD") benefits from December 1, 2012, to March 31, 2016.  As that time period exceeds 24 months, the relevant inquiry is whether Plaintiff was totally and permanently prevented from pursuing any occupation due to injury or disease.  Indeed, the Parties have jointly stipulated that "the 'any occupation' standard applies and the central inquiry is whether DuPont's determination that Plaintiff was not totally and permanently prevented from pursuing any gainful occupation due to an injury or disease was an abuse of discretion."  ECF No. 18 ¶ 6.

In terms of evidentiary proof of disability, the TPD Plan states:

> Satisfactory medical evidence must be provided on which the Company may base a finding that an individual is totally and permanently disabled. The Company may require, in its discretion, a report from the individual's physician and other appropriate information and documentation as part of the basis for determining total and permanent disability.

If DuPont finds that a claimant meets this definition, continued payment of benefits

requires the claimant to periodically submit proof of ongoing disability:

> Payments of benefits will be contingent on the former employee's providing evidence satisfactory to the Company, when and so often as the Company may require, that he continues to be totally and permanently disabled, and undergoing such medical examinations as the Company may require. Failure to furnish such proof or to cooperate with the Company's Medical Division shall result in benefits under this Plan being terminated.

In sum, the claimant bears the burden of providing "satisfactory medical evidence" on an ongoing basis to prove that she continues to be totally and permanently prevented from pursuing any occupation due to an injury or disease.

## II.    PROCEDURAL HISTORY

On November 30, 2017, Plaintiff filed a Complaint in the Greenville County Court of Common Pleas, and Defendants removed the action within 30 days of service. ECF No. 1. In the Complaint, Plaintiff alleges she is unable to perform the duties of any occupation. The only specific disability alleged is POTS. Plaintiff alleges a single cause of action under 29 U.S.C. § 1132(a)(1)(B) to recover LTD benefits. Defendants Aetna and DuPont were dismissed without prejudice, leaving the TPD Plan as the only Defendant.

On June 18, 2018, the Parties filed a Joint Stipulation regarding the Administrative Record, Plan Documents, standard of review, and other matters. ECF No. 18. The Administrative Record and Plan Documents are attached thereto as Exhibits 1 through 26. The Parties stipulated the Court may dispose of this case based on cross-memoranda for judgment. The Parties further stipulated that the central inquiry for resolution by the Court is "whether DuPont's determination that Plaintiff was not totally and permanently prevented from pursuing any gainful occupation due to an injury or disease was an abuse of discretion."

On June 18, 2018, the Parties filed their cross motions for summary judgment. ECF Nos. 17, 19.  Under the Amended Specialized Case Management Order, response briefs were due by June 25, 2018.  ECF No. 15.  Defendant filed a response brief on June 25, 2018.  ECF No. 20.  Plaintiff did not file a response brief.

## III.    CONCLUSIONS OF LAW

### A.  Standard of Review

A denial of benefits challenged under § 1132(a)(1)(B) is reviewed under an abuse of discretion standard where, as here, "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Here, the Parties have stipulated that the standard of review is abuse of discretion.  ECF No. 18 ¶ 3.

The abuse of discretion standard is "highly deferential" to the plan administrator. *Cosey v. Prudential Ins. Co. of Am.,* 735 F.3d 161, 168 (4th Cir. 2013).  In applying this standard, "[t]he court must not disturb the administrator's decision if it is reasonable, even if the court itself would have reached a different conclusion."  *Haley v. Paul Revere Life Ins.,* 77 F.3d 84, 89 (4th Cir. 1996) (citation omitted).  In assessing reasonableness of the administrator's decision, the Court may consider non-exclusive factors, including:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Champion v. Black & Decker (U.S.) Inc.,* 550 F.3d 353, 359 (4th Cir. 2008) (quoting *Booth*

*v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342–43).  Here, the Parties have only made arguments relating to the first, third, fifth, seventh, and eighth factors.  Analysis of those factors is subsumed within the Court's discussion below.

## B. DuPont's Decision to Uphold the Denial of Benefits Was Not an Abuse of Discretion.

### 1. DuPont's Determination Was Supported by Substantial Evidence.

As stipulated, the central inquiry is whether it was an abuse of discretion for DuPont to determine that Plaintiff was not totally and permanently disabled under the TPD Plan, i.e. that she was not totally and permanently prevented from pursuing any occupation due to injury or disease.  ECF No. 18 ¶ 6.  The Administrative Record contains substantial evidence supporting DuPont's determination.

First, Plaintiff's treating physicians opined that Plaintiff is capable of working. Plaintiff's most recent primary care physician, Dr. Lemley, stated he thought Plaintiff was able to do sedentary work.  This is consistent with his earlier notes, in which the only limitation listed was prolonged standing.[6]  In addition, Plaintiff's most recent treating cardiologist, Dr. Sorrentino, stated that Plaintiff does not have any cardiovascular impairments and is capable of full-time work.  Dr. Sorrentino's opinion is corroborated by his earlier discharge notes, which stated that Plaintiff had "no restric[tions]" from physical activity.  None of Plaintiff's other treating physicians ever imposed any permanent restrictions or limitations that would prevent Plaintiff from working in any capacity.[7]

---

[6] Also, when referencing Plaintiff's alleged inability to work, Dr. Lemley frequently qualified Plaintiff's own opinions as separate from his own.

[7] In October 2012, Dr. Leman stated that Plaintiff should avoid using heavy equipment and other hazardous duties.  Not all jobs involve heavy equipment and hazardous duties,

Second, objective medical testing consistently found that Plaintiff's neurological, cardiovascular, and other systems were operating normally. As detailed in the Factual Background of this Order and the reports of the third-party physicians who did peer reviews, Plaintiff underwent numerous procedures—MRIs, EKGs, EMGs, CT scans, Holter Monitors, ultrasounds, blood tests, and urinalysis—and none of the tests established significant abnormalities. Although there were a few instances of mildly high blood pressure and heart rate, those are not "totally and permanently" disabling conditions. Plaintiff's alleged disabling condition (POTS) was never decisively diagnosed and was ultimately refuted by objective evidence. Dr. Sorrentino administered a tilt table test in May 2016, and Plaintiff had a "normal response." There was "no evidence for postural orthostatic tachycardia syndrome." All of the objective medical testing corroborates the treating physician's opinions that Plaintiff is able to work.

Third, two board-certified physicians performed thorough peer reviews of the entire claim file, spoke with the treating physicians, and drafted lengthy reports analyzing the available medical evidence. Dr. Weinstein determined there was "no definitive diagnosis" and no medical evidence establishing any cardiac or neurologic condition that would functionally impair Plaintiff and prevent her from working. Dr. Sims concluded that the medical records did not support a POTS diagnosis and there were no cardiovascular impairments that would prevent Plaintiff from working. In addition, a nurse at Aetna did a

---

so this restriction would not prevent Plaintiff from working any occupation. Dr. Leman also did not say the restriction was permanent. In October 2012, Dr. Schaefer restricted Plaintiff from her *own* occupation for 6-12 months because it involved hazardous equipment and working in high, precarious places. He did not impose any permanent restrictions that would preclude her from working any occupation.

full clinical review of the file and concluded that Plaintiff was not totally disabled. In sum, there is abundant evidence showing that DuPont made a reasonable decision. This level of evidence exceeds the required threshold.

Further, DuPont's decision was not an abuse of discretion because Plaintiff's POTS diagnosis was refuted by Dr. Sorrentino's objective medical testing, and there was no medically supported diagnosis of a disabling condition. *Compare Scott v. Eaton Corp. Long Term Disability Plan*, 454 F. App'x 154, 157-58, 160-61 (4th Cir. 2011) (reversing district court and holding that administrator's decision to deny LTD benefits was not an abuse of discretion where diagnoses made by primary care physician were refuted by specialists and objective tests, and primary care physician's opinion that plaintiff was totally disabled was contradicted by peer review physicians).

The Court notes, however, that it is concerned with the comments of DuPont's Medical Director—Dr. Suzanne Sherman. In an email to a DuPont Human Resources representative, Dr. Sherman addressed an incident where Plaintiff burned herself while frying chicken. Dr. Sherman stated:

> Notably, the final assessment of record 16 Oct 2016 is for medical care obtained for a second degree burn obtained while frying chicken (McDuffie Medical Associates). This action on the part of the claimant, that is the choice to fry chicken in her home is inconsistent with an individual who perceived herself to be completely disabled.

This comment is inappropriate and factually inaccurate. People who are disabled struggle on a daily basis to take care of their activities of daily living. They also have to eat, and often have to feed their family. Such absurd commentary is inappropriate in the context of a LTD appeal, and the Court has expressly disregarded this opinion in its review of this case.

In sum, the treating physicians' opinions, the peer review physicians' opinions, and the results of objective medical tests all reasonably lead to the same conclusion: Plaintiff was not totally disabled under the TPD Plan. Thus, the decision to deny further LTD benefits was within DuPont's discretionary authority.

**2. The Evidence Relied Upon by Plaintiff Does Not Show that DuPont's Determination Was Unreasonable.**

**a. Medical Records**

Plaintiff cites to medical records from 2012: (1) Dr. Robert Leman's records from 2012, (2) the evaluation form filled out by nurse Lynne Jamison in 2012, and (3) a letter written by Dr. Marcus Schaefer in 2012. ECF No. 17 at 4-6, 11 n.9. These records include Plaintiff's self-reported symptoms, but it is reasonable to deny an LTD claim that depends on self-reported symptoms and not objective medical tests.

Further, Dr. Leman only restricted Plaintiff from using heavy equipment and other hazardous duties, and Dr. Schaefer only restricted her from working in her *own* occupation for 6-12 months. These physicians never opined that Plaintiff was totally and permanently disabled and never issued medical restrictions that would prevent her from working in any capacity. Further, it was reasonable for DuPont to give less weight to Nurse Jamison's conflicting and ambiguous opinion, stating both that Plaintiff is (1) permanently disabled and unable to do clerical work, and (2) able to do clerical work.

In addition, it was reasonable for DuPont to give less weight to the 2012 opinions and more weight to the more recent 2016 opinions of Dr. Lemley, Dr. Sorrentino, Dr. Weinstein, and Dr. Sims—all concluding that Plaintiff was not medically restricted from working in any capacity. The 2016 physician opinions were informed by more recent

office visits, physical exams, and diagnostic tests (such as the tilt table test). It was reasonable for DuPont to rely on the more recent and better-informed opinions made in 2016, especially because the TPD Plan requires Plaintiff to periodically submit proof that she "continues to be" totally and permanently disabled.

Plaintiff also cites records relating to a broken arm in 2017. ECF No. 17 at 16. The June 2017 records include diagnostic and treatment information for a broken arm and a benign bone lesion. They do not include significant diagnostic tests or treatment of Plaintiff's allegedly disabling condition, POTS. Under the TPD Plan, only medical conditions that commence prior to termination of employment may be considered. The broken arm did not exist prior to Plaintiff's last day of work in 2012, and therefore cannot be considered here. Further, the TPD Plan only covers conditions that are "permanently" disabling. A broken arm is not permanently disabling. The orthopedic physicians instructed Plaintiff that her right arm should not bear weight for at least two weeks. These physicians did not certify that Plaintiff was *permanently* disabled or give her any *permanent* restrictions.

### b.  Social Security Award

Plaintiff relies on an Administrative Law Judge's ("ALJ's") determination that Plaintiff was disabled under SSA regulations. *See* ECF No. 17 at 7-8, 29-31. The ALJ's determination, made in June 2014, was premised on the POTS diagnosis as the sole condition limiting Plaintiff's ability to work. The ALJ did not have the benefit of the results of more recent diagnostic tests from 2015 and 2016, such as the tilt table test, or Plaintiff's more recent treating physicians' opinions that Plaintiff did not have POTS and was not medically restricted from working. The SSA award is also irrelevant because the TPD

Plans terms do not "mirror" the SSA regulations. *See Smith v. Continental Cas. Co.*, 369 F.3d 412, 420 (4th Cir. 2004) ("[W]hat qualifies as a disability for social security disability purposes does not necessarily qualify as a disability for purposes of an ERISA benefit plan—the benefits provided depend entirely on the language in the plan.").

### c. Interrogatory Responses of Vocational/Rehabilitation Consultant

Plaintiff also relies on interrogatory responses of a Rehabilitation Consultant, which were paid for by Plaintiff to help obtain Department of Veterans Affairs ("VA") benefits. *See* ECF No. 17 at 10-12, 15. However, these interrogatory responses suffer from the same deficiencies as the ALJ's decision. The Consultant's responses were not based on the most current medical information and applied VA regulations which do not mirror the terms of the TPD Plan. Moreover, the Consultant was required to "assume" a long list of debilitating medical limitations, which are not supported by Plaintiff's actual medical records as found in the Administrative Record.

### d. Resolution of Conflicting Medical Evidence

Although the evidence cited by Plaintiff may be relevant, the Administrative Record contains abundant evidence supporting the denial of LTD benefits, including objective medical tests and medical opinions from both treating and peer review physicians. It is not an abuse of discretion for a plan administrator "to resolve conflicting medical assessments." *Webster v. Black & Decker (U.S.) Inc.,* 33 F. App'x 69, 75 (4th Cir. 2002) (citation omitted).

**3. DuPont's Determination Was the Result of a Deliberate, Principled Process.**

DuPont delegated the initial decision and appeal to Aetna, a third-party claims administrator. Aetna initially approved Plaintiff for LTD benefits. At that time, Plaintiff had been tentatively diagnosed with POTS by Dr. Leman, and a nurse had indicated that Plaintiff had some permanent impairments and could not perform clerical work.

After the initial approval, numerous objective medical tests were performed that found no abnormalities. Plaintiff also moved to Georgia and did not establish care with a doctor for over a year, calling into question her status as totally disabled. Consistent with the TPD Plan's requirement that Plaintiff provide satisfactory medical evidence showing that she "continues" to be totally disabled, Aetna sent numerous requests for medical evidence between June 2015 and February 2016. Plaintiff provided minimal evidence in response. A registered nurse performed a full review of the file and determined that there was insufficient medical evidence to support the POTS diagnosis or any restrictions and limitations. Aetna issued its initial decision to terminate benefits and explained that (1) it had persistently given Plaintiff opportunities to provide evidence, (2) the medical information received was not enough support a finding of total and permanent disability, and (3) plaintiff stopped responding to requests for proof. Aetna gave Plaintiff 180 days to appeal and explained that Aetna would consider any additional medical information on appeal.

Plaintiff was represented by counsel during the appellate process and submitted additional records. The new records included Dr. Hartmann's neurological testing and Dr. Sorrentino's cardiovascular testing, neither of which revealed any abnormalities. At

Aetna's request, two board-certified physicians prepared detailed reports analyzing all of the available evidence. The peer review physicians did not ignore evidence that might favor Plaintiff's position. For example, Dr. Weinstein addressed the appeal letter drafted by Plaintiff's counsel, the Rehabilitation Consultant's report, and the SSA's disability determination,[8] and Dr. Sims addressed the isolated instances of cardiovascular anomalies. Both Dr. Weinstein and Dr. Sims were able to consult by phone with treating physicians and clarify their views with respect to potential diagnoses and related restrictions. In deciding to deny the appeal, Aetna reviewed all the available evidence and summarized the evidence that it found most relevant. Aetna notified Plaintiff that she would be given a second opportunity to appeal and submit additional information to Dupont.

In considering the second-level appeal, DuPont's Benefit Appeals Committee evaluated all of the records available, including the new records submitted with the second-level appeal. The Committee prepared a factual summary and held a meeting to discuss and decide Plaintiff's appeal. DuPont then issued its final decision to deny the second-level appeal, explaining that the evidence provided did not substantiate a finding of total and permanent disability as defined by the TPD Plan. Dupont's second-level appeal opinion was the final result of a lengthy and principled process that entailed thorough consideration of the evidence at multiple stages. These procedures do not constitute an abuse of discretion.

---

[8] Aetna and DuPont also considered the SSD award and the Rehabilitation Consultant's opinions but declined to give them substantial weight for legitimate reasons, which are articulated in the record and are reasonable, as discussed below.

Plaintiff contends that Aetna and DuPont did not consider the SSD Award and the Vocational Consultant's report. ECF No. 17 at 9, 12, 14-15, 29, 31. This is contrary to the record. In its March 30, 2016 denial letter, Aetna specifically addressed the SSD Award: "our disability determination and the SSD determination are made independently and are not always the same" because: (1) there are differences between the SSA regulations and the TPD Plan, and (2) Aetna and the SSA might have reviewed different information. Aetna stated it was "unable to give [the SSD award] significant weight." On October 5, 2016, Aetna specifically noted that the SSD award was "almost 3 years old" and "would not be relevant to current medical conditions(s) and or any restrictions or limitations."

Further, during the appeal, Aetna provided the ALJ's decision and the Vocational Consultant's responses to the peer review physicians who expressly considered them prior to making conclusions. In the "decision rationale" section of its claim notes, Aetna summarized the peer review reports and explained that records dependent on the POTS diagnosis were not persuasive: "the vocational rehabilitation specialist was working on old data and did not have the current documentation that the claimant does not have postural orthostatic tachycardia syndrome." In its appeal denial letter, Aetna stated that it had considered "the entire claim file" and apparently placed substantial weight on the opinions of the peer reviewers and treating physicians, rather than the outdated SSD award and the Vocational Consultant's responses.

During the second-level appeal, Aetna sent DuPont all of the medical records, which included the SSD determination and related records. DuPont created its own appeal summary, which specifically referenced both the ALJ's decision and the

Vocational Consultant's responses. DuPont explained that these records were not persuasive because they were outdated, reliant on Plaintiff's subjective symptoms, and did not consider a full array of potential occupations under the any occupation standard. In its letter denying Plaintiff's second-level appeal, DuPont explained that its Benefits Appeal Committee did "a thorough review of the medical records provided by Aetna and Ms. Hines' attorney" and determined that Plaintiff had not proven that she was totally and permanently disabled.

The fact that Aetna and DuPont did not specifically refer to the SSD Award or the Vocational Consultant's responses in their appeal denial letters is not material under the circumstances presented. "The committee is not required to make specific findings with regard to each piece of evidence before it for its decision to be reasonable." *Faulkner v. Columbia Gas Transmission*, No. 5:09-cv-123, 2012 WL 589181, at *5 (N.D.W. Va. Feb. 22, 2012). Aetna and DuPont's earlier observations—that the SSD Award and Vocational Consultant's responses were based on outdated information and not consistent with the TPD Plan's terms—are reasonably sufficient based on Fourth Circuit case law.

Plaintiff also contends that DuPont did not consider the June 2017 medical records submitted with her second-level appeal. ECF No. 17 at 24-26. DuPont's appeal summary and second-level appeal denial letter, drafted in October 2017 and November 2017, respectively, state that there was a thorough review of the records submitted by Aetna and Plaintiff's attorney "through October 2016." However, a closer examination of the record reveals this is a mere typographical error. The appeal summary refers to a "chondrosarcoma Grade 1 Right Humerus." This is a direct reference to the June 2017 medical records. Further, emails among members of DuPont's Benefits Appeal

Committee also show that the June 2017 medical records were considered.

Plaintiff also suggests that DuPont was required to obtain an independent medical examination ("IME"). ECF No. 17 at 1, 31. However, the TPD Plan did not require DuPont to procure an IME and neither does ERISA.

> [A] plan administrator has no duty to develop evidence that a claimant is not disabled prior to denying benefits. . . . Nothing in the language of the Plan document or in our precedents required [the plan administrator] to seek out IME evidence as a condition to its denial of [plaintiff's] claim.

*Piepenhagen v. Old Dominion Freight Line, Inc.*, 395 F. App'x 950, 957 (4th Cir. 2010). The Court finds that the factual record developed by Defendant is sufficient and that no IME was necessary based on the circumstances and medical evidence in the administrative record.

### 4. DuPont's Decision Was Not Influenced by a Conflict of Interest.

Plaintiff argues that DuPont was operating under a conflict of interest. ECF No. 17 at 27-28, 31. Here, there is merely a structural conflict because DuPont has a "dual role of both evaluating claims and paying claims." *Fortier v. Principal Life Ins. Co.,* 666 F.3d 231, 236 n.1 (4th Cir. 2012). This factor is only significant if the plaintiff points to "evidence of how the conflict of interest affected the interpretation made by the administrator," *Fortier,* 666 F.3d at 236 n.1, or evidence of "a history of biased claims administration." *Tortora v. Hartford Life & Accident Ins. Co.,* 162 F. Supp. 3d 520, 527-28 (D.S.C. 2016).

Here, Plaintiff has not pointed to any evidence showing that a conflict influenced DuPont's determination or any history of biased decisions. Moreover, DuPont mitigated the conflict by delegating the initial determination and first-level appeal to Aetna, a third-party with no financial interest at stake, and by relying on third-party peer review physicians who prepared detailed, well-reasoned reports and attested that they had no

conflicts of interest.

### IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment, ECF No. 19, is **GRANTED**, and Plaintiff's Motion for Summary Judgment, ECF No. 17, is **DENIED**.  Because the Court affirms the denial of benefits, and in light of the relative resources of the parties, the Court declines to award attorneys' fees to either party.

IT IS SO ORDERED.

s/Donald C. Coggins, Jr.
United States District Judge

March 26, 2019
Spartanburg, South Carolina